# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TATI ABU KING; TONI HEATH JOHNSON,

*Plaintiffs-Appellees*,

AND

BRIDGING THE GAP IN VIRGINIA,

*Plaintiff*,

*v.*

GLENN YOUNGKIN, in his official capacity as Governor of the Commonwealth of Virginia; KELLY GEE, in her official capacity as Secretary of the Commonwealth of Virginia; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia; ROSALYN R. DANCE, in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia; DONALD W. MERRICKS, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; MATTHEW WEINSTEIN, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; SUSAN BEALS, in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia; SHANNON WILLIAMS, in her official capacity as the General Registrar of Smyth County, Virginia,; ERIC SPICER, in his official capacity as General Registrar of Fairfax County, Virginia,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Eastern District of Virginia in Case No. 3:23-cv-00408-JAG, Judge John A. Gibney, Jr.

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

June 21, 2024                    *COUNSEL LISTED ON INSIDE COVER*

VISHAL AGRAHARKAR
EDEN HEILMAN
ACLU FOUNDATION OF VIRGINIA
701 East Franklin Street, Suite 1412
Richmond, VA  23219
(804) 523-2151

JARED FLETCHER DAVIDSON
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA  70117
(202) 579-4582

BENJAMIN L. BERWICK
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA  02472
(202) 579-4582

BRITTANY BLUEITT AMADI
L. ALYSSA CHEN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC  20037
(202) 663-6000

ROBERT KINGSLEY SMITH
JASON H. LISS
ROBERT DONOGHUE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

NICHOLAS WERLE
MATTHEW WOLLIN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

*Attorneys for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENT

**1.    Is party/amicus a publicly held corporation or other publicly held entity?**

No.

**2.    Does party/amicus have any parent corporations?**

No.

**3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?**

No.

**4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?**

No.

**5.    Is party a trade association? (amici curiae do not complete this question)**

No.

**6.    Does this case arise out of a bankruptcy proceeding?**

No.

**7.    Is this a criminal case in which there was an organizational victim?**

No.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

INTRODUCTION ...............................................................................................1

STATEMENT OF ISSUES .................................................................................5

STATEMENT OF THE CASE.............................................................................6

I.     FACTUAL BACKGROUND...............................................................................6

     A.    Virginia's Felony Disenfranchisement Regime .......................6

     B.    The Virginia Readmission Act ...............................................9

     C.    Plaintiffs' Disenfranchisement ..............................................15

II.    PROCEEDINGS BEFORE THE DISTRICT COURT.................................................17

SUMMARY OF ARGUMENT .........................................................................19

ARGUMENT .....................................................................................................21

I.     THE DISTRICT COURT CORRECTLY PERMITTED THIS SUIT TO PROCEED UNDER THE *EX PARTE YOUNG* EXCEPTION TO SOVEREIGN IMMUNITY.................................................................................21

     A.    Plaintiffs Seek Prospective Injunctive Relief Prohibiting Defendants From Continuing To Enforce Virginia's Unlawful Felony Disenfranchisement Regime. ..................................22

          1.    Plaintiffs Allege An Ongoing Violation Of Federal Law.......................................................................................24

          2.    Plaintiffs Seek Prospective Relief Enjoining Defendants' Ongoing Violation Of Federal Law. ...................25

3.     Defendants' Objections To The *Ex Parte Young*
Exception Should Be Rejected....................................................26

B.     Plaintiffs Adequately Allege That Defendants'
Continuing Enforcement of Article II, Section 1 Violates
Federal Law. ...........................................................................35

C.     The Governor And Secretary Are Proper Defendants
Under *Ex Parte Young*. ..........................................................41

II.     THE DISTRICT COURT CORRECTLY HELD THAT THE AMENDED
COMPLAINT STATED A CLAIM FOR RELIEF UNDER FEDERAL
EQUITY. ........................................................................................46

A.     The Collateral Order Doctrine Does Not Permit
Interlocutory Review Of Whether The Amended
Complaint States A Claim.........................................................47

B.     The District Court Correctly Found That Plaintiffs Have
A Cause Of Action Under Federal Equity. ...............................50

1.     The Virginia Readmission Act Does Not Contain
A Specified Remedy That Would Preclude Relief
Under Federal Equity. ..................................................51

2.     The Virginia Readmission Act Does Not Contain
A Judicially Unadministrable Standard. ......................55

CONCLUSION ...........................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alexander v. Sandoval*,
    532 U.S. 275 (2001).................................................................................51

*Antrican v. Odom*,
    290 F.3d 178 (4th Cir. 2002) ...................................................*passim*

*Armstrong v. Exceptional Child Center Inc.*,
    575 U.S. 320 (2015)...................................................................*passim*

*Bogan v. City of Boston*,
    489 F.3d 417 (1st Cir. 2007)..................................................................45

*Bragg v. West Virginia Coal Association*,
    248 F.3d 275 (4th Cir. 2001) ...............................................21, 22, 38

*Butler v. Thompson*,
    97 F. Supp. 17 (E.D.Va. 1951) ...........................................................54

*Constantine v. Rectors and Visitors of George Mason University*,
    411 F.3d 474 (4th Cir. 2005) ...........................................34, 35, 52, 54

*Disability Rights South Carolina v. McMaster*,
    24 F.4th 893 (4th Cir. 2022) .......................................................43, 46

*Everett v. Schramm*,
    772 F.2d 1114 (3d Cir. 1985) .............................................................37

*Ex parte Young*,
    209 U.S. 123 (1908)...................................................................*passim*

*Foster v. University of Maryland-East Shore*,
    787 F.3d 243 (4th Cir. 2015) .............................................................45

*Franks v. Ross*,
    313 F.3d 184 (4th Cir. 2002) .............................................................30

*Green v. Mansour*,
    474 U.S. 64 (1985).........................................................26, 28, 51

*Green Valley Special Utility District v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) (*en banc*) ............................................................27

*Health & Hospitals Corp. of Marion County v. Talevski*,
143 S. Ct. 1444 (2023) ......................................................................................29

*Howell v. McAuliffe*,
292 Va. 320 (2016) ................................................................................2, 42, 43

*In re Stone*,
986 F.2d 898 (5th Cir. 1993) ..............................................................................45

*In re United States Department of Education*,
25 F.4th 692 (9th Cir. 2022) ..............................................................................45

*In re United States*,
985 F.2d 510 (11th Cir. 1993) ............................................................................45

*Industrial Services Group., Inc. v. Dobson*,
68 F.4th 155 (4th Cir. 2023) ......................................................................*passim*

*Japan Whaling Association v. American Cetacean Society*,
478 U.S. 221 (1986) ..........................................................................................56

*Johnson v. Governor of State of Florida*,
405 F.3d 1214 (11th Cir. 2005) (*en banc*) ........................................................42

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) ..............................................................................41

*Merritt v. Jones*,
259 Ark. 380 (1976) ..........................................................................................54

*Michigan Corrections Organization v. Michigan Department of Corrections*,
774 F.3d 895 (6th Cir. 2014) ..............................................................27, 29, 30

*Mont v. Heintz*,
849 F.2d 704 (2d Cir. 1988) ......................................................................37-38

*Mowery v. National Geospatial-Intelligence Agency*,
42 F.4th 428 (4th Cir. 2022) ..............................................................................15

*Papasan v. Allain*,
  478 U.S. 265 (1986)......................................................................40

*Patchette v. Nix*,
  952 F.3d 158 (8th Cir. 1991) ........................................................38

*Pennhurst State School & Hospital v. Halderman*,
  465 U.S. 89 (1984)....................................................................1, 36

*Planned Parenthood South Atlantic v. Baker*,
  941 F.3d 687 (4th Cir. 2019) ........................................................29

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*,
  506 U.S. 139 (1993)......................................................................47

*Quern v. Jordan*,
  440 U.S. 332 (1979)......................................................................44

*Richardson v. Clarke*,
  52 F.4th 614 (4th Cir. 2022) ........................................................47

*Richardson v. Ramirez*,
  418 U.S. 24 (1974)........................................................................39

*Seminole Tribe of Florida v. Florida*,
  517 U.S. 44 (1996)..................................................................34, 35

*Verizon Maryland Inc. v. Public Service Commission of Maryland*,
  535 U.S. 635 (2002).................................................................*passim*

*Virginia Office for Protection & Advocacy v. Stewart*,
  563 U.S. 247 (2011)........................................................25-26, 28, 33

*Wicomico Nursing Home v. Padilla*,
  910 F.3d 739 (4th Cir. 2018) ........................................................32

*Williams On Behalf of J.E. v. Reeves*,
  954 F.3d 729 (5th Cir. 2020) ...................................................*passim*

*Word of Faith World Outreach Center Church, Inc. v. Morales*,
  986 F.2d 962 (5th Cir. 1993) ........................................................38

# STATUTES, CONSTITUTIONAL PROVISIONS, AND RULES

28 U.S.C.
§1291......................................................................................47
§1292......................................................................................47

30 U.S.C. §1253(a) .................................................................38

42 U.S.C.
§§10801 *et seq.* ....................................................................28
§§15001 *et seq.* ....................................................................28

An Act to Admit the State of Mississippi to Representation in the
   Congress of the United States, c. 19, 16 Stat. 67 (Feb. 22, 1870)......................23

An Act to Admit the State of Virginia to Representation in the
   Congress of the United States, c. 10, 16 Stat. 62 (Jan. 26, 1870) ...............13, 53

U.S. Const.
amend. VIII.....................................................................17, 50
amend. XI.........................................................................*passim*
amend. XIII.............................................................................10
amend. XIV.................................................................10, 11, 12

Va. Code Ann.
§24.2-404(A).............................................................................7
§24.2-404(C)-(D)......................................................................7
§24.2-418 ...................................................................................6
§24.2-418.1 ...............................................................................6

Miss. Const.
art. VIII, §1 (1868).................................................................38
art. VIII, §201 ...................................................................38, 40

Va. Const.
art. II, §1..............................................................................*passim*
art. V, §12 .................................................................................8

Virginia Constitution of 1869 ........................................37, 39

Fed. R. Civ. P.
Rule 12(b)(1)............................................................................15
Rule 12(b)(6).......................................................................*passim*

## LEGISLATIVE MATERIAL

Cong. Globe, 41st Cong., 2d Sess. 432 (1870)............................................29, 52, 53

## OTHER AUTHORITIES

Freedmen's Bureau Records: George T.Cook to R.S.Lacey, July 31, 1866, https://valley.lib.virginia.edu/papers/B1003.............................................12

**INTRODUCTION**

Plaintiffs' claim seeking to enjoin the defendant state officials from continuing to disenfranchise Plaintiffs in violation of the Virginia Readmission Act, a federal statute, can proceed under a routine application of this Court's sovereign immunity jurisprudence. The inquiry for determining whether the *Ex parte Young* exception to Eleventh Amendment sovereign immunity applies is "'whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Industrial Services Group., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023) (quoting *Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635, 645 (2002)).[1] Both requirements are satisfied.

Defendants do not dispute that Plaintiffs seek prospective, not compensatory, relief. And Defendants admit that Plaintiffs' claim is "brought under a federal law, the Virginia Readmission Act." Opening Brief ("Br.") 36. Their principal argument before the district court, and reasserted on appeal, is unsupported by citation to ***any*** case from ***any*** court: that the Eleventh Amendment bars a federal court from enforcing a federal statute if it might need to interpret aspects of state law along the way. *See* Br.36-38. Multiple Circuits expressly rejected Defendants' erroneous interpretation of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106

---

[1] Unless otherwise specified, internal citations, quotations and alterations have been omitted from and all emphases added to all sources cited herein.

(1984), in the first few years after *Pennhurst* was decided. The district court thus correctly held that the *Ex parte Young* exception to sovereign immunity applies.

The Fifth Circuit reached the same conclusion just four years ago, when it reversed dismissal of a similar claim under a provision of the Mississippi Readmission Act, applying the *Ex parte Young* exception to sovereign immunity. *See Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729, 732 (5th Cir. 2020). This action should likewise proceed.

While Defendants concede that election administrators were properly named under *Ex parte Young*, they separately seek dismissal of the Governor and the Secretary of the Commonwealth because they supposedly do not enforce Virginia's felony disenfranchisement regime. But the Governor is the ***only*** official expressly identified in the text of Article II, Section 1 of the Virginia Constitution, which disqualifies any Virginian convicted of any felony from voting, unless the Governor individually grants clemency. The Supreme Court of Virginia has confirmed the Governor is thus charged with enforcing the Constitution's general rule of mass disenfranchisement. *See Howell v. McAuliffe*, 292 Va. 320, 349 (2016). The Secretary of the Commonwealth administers the relevant processes on the Governor's behalf. The Governor and the Secretary therefore play critical roles in the apparatus that has stripped Plaintiffs and countless other Virginians of their voting rights, in direct contravention of federal law. They should not be dismissed.

Finally, Defendants seek interlocutory review of an analytically distinct issue: the district court's conclusion that Plaintiffs plausibly stated a claim for injunctive relief under federal equity. But the collateral order doctrine, which permits review of the sovereign immunity ruling, does not confer appellate jurisdiction to review this separate Rule 12(b)(6) issue. Just last year, this Court confirmed that it narrowly construes the doctrine of pendent appellate jurisdiction in this exact circumstance. *See Dobson*, 68 F.4th at 166-167. The Court therefore has no jurisdiction to hear Defendants' Rule 12(b)(6) argument—which Defendants did not even present to the district court. The Court need not and should not review this or any other merits issue before a final judgment has issued in the district court.

In any event, Defendants' new argument under Rule 12(b)(6) is wrong. Defendants assert that Plaintiffs failed to state a claim in federal equity because the Reconstruction Congress that passed the Virginia Readmission Act supposedly intended the sole remedy for Virginia's violation of the Act to be the resuspension of the Commonwealth's congressional representation. There is neither textual nor historical support for this construction. To the contrary, congresspeople explained at the time that they expected the federal courts would enforce the Readmission Acts if any of the former Confederate states again manipulated its constitution and criminal laws to expand the scope of its felony disenfranchisement regime. That is precisely what Plaintiffs request here.

This case concerns the unlawful denial of voting rights to many thousands of Virginians today and countless more in the future. Defendants enforce that disenfranchisement regime in direct violation of a federal statute. Whatever issues Defendants may have regarding the merits of Plaintiff's Virginia Readmission Act claim are not under review on this interlocutory appeal. Appellate jurisdiction currently only exists to review the district court's denial of sovereign immunity. Under this Court's *Ex parte Young* case law, that sovereign immunity issue is straightforward. The aspect of the district court's order denying sovereign immunity should be affirmed, and Plaintiffs' claim should proceed.

# STATEMENT OF ISSUES

1.      Whether Plaintiffs' claim may proceed under the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity, because the First Amended Complaint requests only prospective relief from Defendants' ongoing enforcement of the Virginia Constitution's felony disenfranchisement provision in violation of a federal statute, the Virginia Readmission Act.

2.      Whether the roles of the Governor and the Secretary of the Commonwealth in enforcing the felony disenfranchisement provision of Article II, Section 1 of the Virginia Constitution establish the special relation required for them to be sued under *Ex parte Young*.

3.      Whether the Court lacks pendent appellate jurisdiction for interlocutory review of whether Plaintiffs stated a claim under federal equity and, if it has such jurisdiction, whether Plaintiffs stated a claim in federal equity upon which relief may be granted.

<center>**STATEMENT OF THE CASE**</center>

## I.    FACTUAL BACKGROUND

### A.    Virginia's Felony Disenfranchisement Regime

The Virginia Constitution provides that a Virginian is entitled to register to vote, and then is qualified to vote, if the person is at least eighteen years old, a resident of the Commonwealth, and a citizen of the United States. Va. Const. art. II, §1; JA207. To register to vote in Virginia, a qualified person applies to the Virginia Department of Elections, which then replies confirming the person's registration status. Va. Code Ann. §§24.2-418, 24.2-418.1.

However, the Virginia Constitution also provides that ***any*** person convicted of ***any*** felony is automatically disqualified to vote, subject only to the Governor's individualized restoration of rights. Specifically, Article II, Section 1 of the Virginia Constitution provides:

> No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority.

Va. Const. art. II, §1; JA46[¶63] ("FAC").

Virginia's felony disenfranchisement regime is the country's most restrictive. Virginia is one of only three states with a constitution that permanently strips citizens convicted of any felony of their right to vote absent the Governor's discretionary restoration of voting rights. JA46-47[FAC¶65]. And of those three, Virginia is the

only state that has no process for automatically restoring citizens' voting rights upon the achievement of specified conditions. *Id.* An estimated 312,540 Virginians are presently disenfranchised under Article II, Section 1's felony disenfranchisement regime. JA30[FAC¶10]. This makes Virginia the state with the fifth-highest number of citizens disenfranchised for felony convictions (despite being only the twelfth largest state by population) and the sixth highest overall disenfranchisement rate. *Id.*

Defendants collectively enforce Article II, Section 1's felony disenfranchisement provision through a state-wide administrative apparatus involving the Governor, the Secretary of the Commonwealth, the State Board of Elections, the Department of Elections, and the general registrars for the cities and the counties. JA33-36[FAC¶¶24-40].

The Virginia Department of Elections administers an electronic voter registration system, which includes a state-wide database to prevent disenfranchised Virginians from registering. *See* Va. Code Ann. §24.2-404(A). Defendant Susan Beals is the Commissioner of the Department of Elections. JA35[FAC¶36]. The State Board of Elections establishes procedures to ensure that the Department and the general registrars administer the registration system in compliance with Virginia law. *See* Va. Code Ann. §24.2-404(C)-(D). Defendants John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, and Matthew Weinstein discharge the Board's statutory duties. *See* JA34-35[FAC¶¶28-33].

The Department's statewide voter registration system receives monthly reports of new felony convictions from state and federal law enforcement agencies. JA77. The Department uses these reports to identify currently registered voters, whose registrations are placed in the "felon hopper" for each locality, and to populate a "prohibited table" in the registration system with information to identify people who have been convicted of a felony. JA77-78. The general registrars in each county receive information about registrations matching data in their localities' "felon hoppers," and they use this information to cancel the registrations of citizens who have been convicted of a felony. JA78.

Similarly, when an unregistered citizen attempts to register, the voter registration system determines if there is a match between the application and the "prohibited table." JA78. Where there is a match, the registration system informs the general registrar, who denies the registration application. *Id.*

Article II, Section 1 vests in the Governor the discretion whether to restore a disenfranchised Virginian's voting rights as an aspect of the executive's clemency power. *See* Va. Const. art. II, §1; *id.* art. V, §12 ("The Governor shall have the power … to remove political disabilities consequent upon conviction for offenses committed."). Governor Youngkin has elected to retain unfettered discretion rather than define any criteria entitling Virginians to rights restoration or any timeline for decision. *See* JA30[FAC¶12]. By contrast, Virginia's three prior governors

employed objective criteria and a definite time frame for determining whether to grant a disenfranchised citizen's rights restoration application. *See id.*

The Secretary of the Commonwealth administers the application process for restoration of voting rights. JA73. Applicants must provide the Secretary with information including the nature of their convictions, whether their convictions involved violence, whether they have completed all terms of incarceration, whether they are serving any form of state supervision, and whether they have paid or are paying all fines, fees, and restitution. *Id.* If the Secretary approves an application, it goes to the Governor, who decides whether to issue an individualized order restoring the citizen's voting rights. JA74. If the Governor issues an order restoring an individual's rights, the Secretary then provides information concerning the restoration-of-rights order to the Department of Elections, which amends the prohibited table. JA77-78. If a citizen's voting rights restoration application is denied, that denial is conveyed to that person by the Secretary. JA33-34[FAC¶26]. Citizens whose rights-restoration applications are denied remain disenfranchised indefinitely. *Id.*

### B. The Virginia Readmission Act

In the decades preceding the Civil War, Virginia used its criminal laws to effectively eliminate all free Black citizens from the Commonwealth, including by enslavement, expulsion, or murder. "As early as 1824, Virginia law provided that

when any free person of Black descent was convicted of a crime punishable by imprisonment for more than two years, instead of being imprisoned, that person would be enslaved (among other punishments)." JA37[FAC¶43].

The passage of the Thirteenth Amendment in December of 1865 ended slavery, "but it did not address whether formerly enslaved people had the full rights of citizenship—including the right to vote." JA37[FAC¶44]. As a result, the voting rights of Black citizens were especially vulnerable in former Confederate states like Virginia. These former Confederate states had governments comprised of former Confederate officials and supporters of slavery. These state governments immediately set about placing statutory restrictions on the rights of Black citizens, with the goal of restricting Black voting power. These laws—known as "Black Codes"—significantly increased both incarceration and disenfranchisement among Black citizens. JA37[FAC¶45].

"In 1866, Congress sought to prevent this widespread disenfranchisement of Black citizens in the former Confederate states by adopting the Fourteenth Amendment." JA39[FAC¶48]. "Ultimately ratified in 1868, the Fourteenth Amendment provided that '[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.'" *Id.* "And it specified that representatives would be apportioned among the states in accordance with the number of citizens in each state,

with one key exception: that states in which "the right to vote at any election" was denied or in any way abridged "except for participation in rebellion, or other crime" had their congressional representation reduced in proportion to the extent of that abridgment." *Id.* Once ratified, the Fourteenth Amendment prohibited states from disenfranchising citizens unless those citizens had participated in "rebellion, or other crime." *Id.*

Virginia and other former Confederate states immediately enacted laws denying Black citizens the right to vote while preserving their Congressional representation—namely, by exploiting the Fourteenth Amendment's "other crime" language. JA39-40[FAC¶49]. States expanded the scope of crimes that resulted in disenfranchisement to include less serious crimes. *Id.* Several states changed their laws to upgrade misdemeanor property crimes to felonies for which they could disenfranchise citizens, for example by redefining grand larceny to include the theft of any items worth more than two dollars. *Id.* Another mechanism was to punish petty crimes with public whippings, which resulted in disenfranchisement. *Id.* These efforts were so prevalent that they drew federal attention. *Id.* For example, an agent of the Freedmen's Bureau in Lynchburg, Virginia wrote: "There seems to be a growing spirit among the whites of resolve to keep the freed people 'in their

proper place' as they term it, or in other words to keep them as nearly as possible to their former state of servitude."[2] *Id.*

In 1867, with ratification of the Fourteenth Amendment pending, Congress passed the Military Reconstruction Acts to restrict the ability of Virginia and other former Confederate states to expand disenfranchisement. JA41[FAC¶51]. Premised on the conclusion that the governments of Virginia and nine other states were not "loyal and republican State governments," the first Military Reconstruction Act required each state to call a constitutional convention to rewrite its constitution. Moreover, the first Military Reconstruction Act prohibited state constitutions from disenfranchising any adult man except for "participation in the rebellion or for felony at common law." *Id.* (quoting First Reconstr. Act, Preamble (Mar. 2, 1867)). In 1869, Virginia adopted a Constitution under this Military Reconstruction Act framework. JA41-42[FAC¶52].

When Congress decided to readmit the former Confederate states to federal representation, it passed a set of substantively identical Readmission Acts. JA41-42[FAC¶52]. The Readmission Acts, including the Virginia Readmission Act, built on the Military Reconstruction Act by imposing several ongoing, "fundamental conditions" on the former Confederate states, including:

---

[2] Freedmen's Bureau Records: George T.Cook to R.S.Lacey, July 31, 1866, https://valley.lib.virginia.edu/papers/B1003 (cited at JA40[FAC¶49n.21]).

First, That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, ***except as a punishment for such crimes as are now felonies at common law***, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State.

16 Stat. 62 (emphasis added); JA41-42[FAC¶52]. The Virginia Readmission Act therefore expressly prohibits Virginia from amending its constitution to expand disenfranchisement except for conviction of an offense that was a felony at common law in 1870.

The Virginia Readmission Act's enfranchisement provision sought to protect Virginians' political rights through two requirements. JA42[FAC¶54]. ***First***, by restricting lawful disenfranchisement to convictions for crimes that were felonies at common law in 1870, when the Act was passed, the Virginia Readmission Act prohibits disenfranchising citizens on the basis of new, statutory felonies. *Id.* ***Second***, by permitting disenfranchisement only as the result of a criminal process "equally applicable to all" residents, the Virginia Readmission Act sought to prevent Virginia from selectively enforcing certain criminal laws predominantly against Black citizens and then using those convictions to disenfranchise. *Id.*

The Virginia Readmission Act has never been repealed or otherwise dismantled. JA42[FAC¶55]. Virginia accordingly remains bound by all of its requirements, including the "fundamental condition" that the Commonwealth cannot

strip citizens of the right to vote "except as a punishment for such crimes as [were] felonies at common law" in 1870.  JA46[FAC¶64].

Despite this, Virginia's Constitution, twice amended since 1870, disenfranchises people who have been convicted of *any* felony—in violation of the Virginia Readmission Act.  JA29[FAC¶7].  As a result, approximately 312,540 Virginians are currently disenfranchised, making Virginia the state with the fifth-highest number of citizens disenfranchised for felony convictions, and the sixth-highest rate of disenfranchisement.  JA30[FAC¶10].  Many Virginians are disenfranchised because of convictions for crimes that were not felonies at common law in 1870, such as controlled substances crimes.  JA48[FAC¶71].

This impact has fallen disproportionately on Black Virginians—the very population Congress sought to protect with the Virginia Readmission Act.  JA30[FAC¶11].  Although Black Virginians comprise less than 20% of Virginia's voting age population, they account for nearly half of all Virginians disenfranchised due to a felony conviction.  *Id.*  Felony disenfranchisement among Black, voting-age Virginians is nearly two-and-a-half-times as high as the rest of Virginia's voting-age population.  *Id.*  And the rate of felony disenfranchisement among Black, voting-age Virginians is more than *twice as high* as the rate of felony disenfranchisement among the Black voting-age population nationwide.  *Id.*

## C.   Plaintiffs' Disenfranchisement

Plaintiffs are two Virginians who, but-for Defendants' enforcement of Article II, Section 1's felony disenfranchisement regime, would register and vote. JA32[FAC¶¶18, 22].

Plaintiff Tati Abu King is a 53-year-old citizen of Virginia who is disenfranchised based on a December 2018 conviction in Fairfax County for felony possession of marijuana with intent to distribute.  JA31[FAC¶¶14-15].  Mr. King lives in Alexandria with his fiancé and two stepchildren.  JA31[FAC¶14].  After 11 months' incarceration, Mr. King was released in June 2019; he subsequently completed probation and owes no fines associated with his conviction. JA31[FAC¶15].  Mr. King was previously disenfranchised from a 1988 robbery conviction, but Governor McAuliffe granted his rights-restoration application in 2016.  JA74.[3]  Mr. King was registered to vote prior to his December 2018 felony conviction.  JA31[FAC¶16].  Since Mr. King's disenfranchisement following his December 2018 conviction, he has been prohibited from voting in the 2018 midterm

---

[3] Defendants' opening brief improperly relies on extrinsic evidence about Mr. King and Ms. Johnson's prior convictions from the Declaration of Secretary Gee.  On a Rule 12(b)(1) motion to dismiss, "courts may consider affidavits and other extrinsic information to determine whether subject matter jurisdiction exists."  *Mowery v. National Geospatial-Intelligence Agency*, 42 F.4th 428, 433 (4th Cir. 2022).  But details of Plaintiffs' prior criminal records do not contradict any allegation in the FAC and are immaterial to any issue bearing on sovereign immunity, so they cannot be used to determine whether subject matter jurisdiction exists.

elections, the 2020 presidential election, the 2021 Virginia gubernatorial election, the 2022 midterm elections, and the November 2023 Virginia elections. JA31[FAC¶15]. Were Mr. King not disenfranchised, he would have voted in each of those elections. JA31[FAC¶17].

Mr. King applied in April 2023 for restoration of his voting rights. JA74. Secretary Gee denied that application on May 21, 2024. Br.7 n.1. Were Mr. King permitted to do so, he would register and vote in upcoming elections. JA32[FAC¶18].

Plaintiff Toni Heath Johnson is a 61-year-old Virginian disenfranchised based on 2021 convictions in Washington County for felony drug possession and related child-endangerment charges. JA32[FAC¶¶20-21]; JA75. Ms. Johnson was released from incarceration in 2022 and is on probation. JA32[FAC¶20]. Ms. Johnson was previously disenfranchised from prior felony convictions, but her voting rights were restored and so she was qualified to vote before her 2021 convictions. JA32[FAC¶21]. Ms. Johnson lives in Marion in Smyth County where she cares for her ill wife. JA32[FAC¶19]. Since her release, Ms. Johnson has been unable to vote in the 2022 midterm election and the November 2023 Virginia elections. JA32[FAC¶21]. Had Ms. Johnson not been disenfranchised, she would have voted in those elections. *Id.*

Ms. Johnson applied for her voting rights to be restored following her 2022 release from incarceration. JA32[FAC¶22]. Ms. Johnson learned in June 2023 that Defendants denied her application. *Id.* Were Ms. Johnson eligible to do so, she would register and vote in upcoming elections. *Id.*

## II.    PROCEEDINGS BEFORE THE DISTRICT COURT

On June 26, 2023, Plaintiffs filed their original complaint alleging that Defendants' enforcement of Virginia's felony disenfranchisement regime violates the Virginia Readmission Act. *See* JA16. Plaintiffs then amended their complaint to add Eighth Amendment claims. *See* JA21. The FAC seeks declaratory and injunctive relief to prohibit Defendants from enforcing Article II, Section 1 of the Virginia Constitution in violation of the Virginia Readmission Act. JA16, 30-31[FAC¶13]. On September 28, 2023, Defendants moved to dismiss the FAC. JA22.

On March 18, 2024, the district court rejected Defendants' assertion of sovereign immunity, holding that Plaintiffs appropriately alleged that enforcement of Article II, Section 1 of the Virginia Constitution violated the Virginia Readmission Act. JA196. The district court held that Plaintiffs' requested relief is prospective, and thus falls "squarely within the *Ex parte Young* exception to the defendants' Eleventh Amendment immunity." *Id.*; JA204. The court further declined to dismiss the Governor and Secretary because "under Virginia's voting

rights restoration scheme, these defendants may enforce the permanent disenfranchisement of certain individuals," such that "the Governor and Secretary bear a 'special relation' to the challenged law." JA197. The district court also rejected the argument that Plaintiffs' claims present a non-justiciable political question and held that Plaintiffs plausibly stated a claim under the federal equity cause of action. *See* JA198, 204.

On March 26, 2024, Defendants filed a Notice of Interlocutory Appeal. JA24. District court proceedings are stayed pending appeal.

## SUMMARY OF ARGUMENT

1.    The district court correctly held that Plaintiffs' Virginia Readmission Act claim may proceed under the *Ex parte Young* exception to Eleventh Amendment sovereign immunity.  In this procedural posture, the *Ex parte Young* analysis is straightforward and does not reach the merits:  it examines whether the complaint alleges that state officials' ongoing enforcement of state law violates federal law and whether plaintiffs seek only prospective injunctive relief.  Both are true here.

**1.a.**    The FAC undisputedly alleges that Defendants are engaged in ongoing enforcement of the felony disenfranchisement regime established by Article II, Section 1 of the Virginia Constitution.  Nor do Defendants contest that the requested injunctive and declaratory relief is prospective, and thus available under *Ex parte Young*.  Defendants also admit that Plaintiffs' claim alleges a violation of federal law (the Virginia Readmission Act).  That should end the matter.

**1.b.**    Nonetheless, Defendants argue that Plaintiffs' claim is barred because its adjudication may involve interpretation of state law, and *Ex parte Young* does not provide jurisdiction to compel state officials to conform to state law.  But Defendants cite no authority to support this contention, which has been roundly rejected by the courts of appeal.

**1.c.**    Finally, Defendants seek dismissal of the Governor and Secretary, asserting they do not enforce Virginia's felony disenfranchisement regime.

However, the Governor is expressly identified by Article II, Section 1 as determining which Virginians, if any, will have their rights restored, and the Secretary is charged with administering that process. These officials' duties contribute to the administrative apparatus enforcing the disenfranchisement of many thousands of Virginians. Prospective injunctive relief against the Governor and Secretary would help cure that ongoing violation of the Virginia Readmission Act.

**2.a.** Defendants obtained an as-of-right interlocutory appeal under the collateral order doctrine, which provides appellate jurisdiction only over the district court's denial of sovereign immunity. Defendants nonetheless seek review of a Rule 12(b)(6) issue: whether Plaintiffs plausibly stated a claim under in federal equity. But analysis of the sufficiency of Plaintiffs' cause of action is analytically distinct from sovereign immunity, so there is no pendent appellate jurisdiction.

**2.b.** The district court should nonetheless be affirmed on the Rule 12(b)(6) issue, if there were jurisdiction for its review. Defendants concede that Plaintiffs have a federal equity cause of action to enjoin violations of federal law unless Congress intended to displace that inherent authority with an alternative statutory remedy and the statute involves a judicially unadministrable standard. Neither factor applies. The Virginia Readmission Act's text provides no specified remedy for violations, and the legislative history confirms that the Reconstruction Congress intended the federal courts to provide equitable relief should Virginia violate it.

Finally, enforcing the Act in federal equity would require a quintessentially judicial task: interpreting federal law to determine whether the Virginia Constitution, as amended, purports to disenfranchise Virginians who were convicted for offenses that were not felonies at common law in 1870.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY PERMITTED THIS SUIT TO PROCEED UNDER THE *EX PARTE YOUNG* EXCEPTION TO SOVEREIGN IMMUNITY.

Plaintiffs allege that Defendants are unlawfully enforcing the Virginia Constitution to prohibit them from registering to vote because of convictions for crimes that were not felonies at common law in 1870, and that this enforcement violates a federal statute, the Virginia Readmission Act. The FAC requests an injunction that would prohibit Defendants from continuing to enforce Article II, Section 1's felony disenfranchisement provision in violation of federal law.

The Eleventh Amendment prohibits suits against a state "by a state's own citizens," but in "*Ex parte Young*, the Supreme Court devised an exception to Eleventh Amendment immunity for suits brought against state officials." *Dobson*, 68 F.4th at 163 (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). "[T]he *Ex parte Young* doctrine provides that 'a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment.'" *Bragg v. West Virginia Coal Association*, 248 F.3d 275, 292 (4th Cir. 2001). The purpose of this "exception to

Eleventh Amendment immunity is … to preserve the constitutional structure established by the Supremacy Clause." *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002).  The premise of the *Ex parte Young* exception is that "[a] State officer acting in violation of federal law … loses 'the cloak of State immunity,' because in such a situation, 'the State has no power to impart to the official any immunity from responsibility to the supreme authority of the United States.'"  *Id.* (quoting *Bragg*, 248 F.3d at 292 and *Ex Parte Young*, 209 U.S. at 160).  Here, Defendants must submit to the federal courts' jurisdiction because the Virginia Readmission Act "'strip[s] [them] of [their] official … character'" when they unlawfully enforce Article II, Section 1.  *Id.* (quoting *Ex Parte Young*, 209 U.S. at 160).

### A.     Plaintiffs Seek Prospective Injunctive Relief Prohibiting Defendants From Continuing To Enforce Virginia's Unlawful Felony Disenfranchisement Regime.

To invoke *Ex Parte Young*, a "plaintiff['s] **suit [must] allege an *ongoing or continuing*** violation of federal law" and seek only an order "to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Antrican*, 290 F.3d at 184, 186.  The requirement that the allegedly unlawful act must be ongoing or continuing "is satisfied when a state officer's enforcement of an allegedly [unlawful] state law is threatened, even if the threat is not yet imminent." *Dobson*, 68 F.4th at 164.  The FAC's allegations satisfy both requirements.

The Fifth Circuit has already held that a Readmission Act claim similar to Plaintiffs' could proceed under *Ex Parte Young*. *Williams On Behalf of J.E. v. Reeves*, in reversing dismissal, held that *Ex Parte Young* enables a Readmission Act claim to proceed against the Governor of Mississippi and other state officials. 954 F.3d at 732. The Mississippi Readmission Act imposes three "fundamental" conditions virtually identical to those in the Virginia Readmission Act. The *Williams* plaintiffs sued under the third: "'That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said state.'" *Id.* at 732-733 (quoting 16 Stat. 67, 68 (1870)). The *Williams* plaintiffs alleged that "[s]ince 1868, the Mississippi Constitution's education clause has been amended four times," and that the current provision "cause[s] significant disparities in the educational resources, opportunities, and outcomes afforded to children in Mississippi based on their race and the race of their classmates." *Id.* at 733. As the *Williams* Court explained, "a declaration that [the amended] [s]ection … of the Mississippi Constitution conflicts with the Readmission Act[ ]may be pursued under *Ex parte Young*," because the plaintiffs "seek relief for what they allege to be defendants' ongoing violation of federal law—the enforcement of a state

constitutional provision that conflicts with the federal Readmission Act." *Id.* at 738-739.[4]

To assess at the motion to dismiss stage whether the *Ex Parte Young* exception permits a suit against state officials to proceed, "'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Dobson*, 68 F.4th at 163 (quoting *Verizon*, 535 U.S. at 645). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon*, 535 U.S. at 646. The FAC clearly satisfies each element of the *Ex Parte Young* exception to sovereign immunity.

### 1. Plaintiffs Allege An Ongoing Violation Of Federal Law.

Defendants do not dispute that the FAC alleges Defendants are engaged in "ongoing" or "continuing" enforcement of Virginia's felony disenfranchisement regime. The FAC clearly alleges that Defendants are engaged in ongoing enforcement of Article II, Section 1, including through the statewide voter registration system, that prohibits Plaintiffs from registering to vote. And the FAC

---

[4] Defendants acknowledge *Williams* only in a footnote and offer the bare assertion *Williams* "did not address the defects [they] raised" concerning *Ex parte Young*. Br.39 n.6. But Defendants' lack of specificity concerning the purported "defects" they raised only confirms that this case and *Williams* are on all fours with respect to *Ex parte Young*. The Fifth Circuit's thoughtful opinion in *Williams* strongly supports affirmance.

alleges that such enforcement violates the Virginia Readmission Act, because Virginia has twice amended Article II, Section 1, and Defendants enforce it to disenfranchise people who were convicted of offenses that were not felonies at common law in 1870. *See infra* p.35-40, 42.

Specifically, Defendants' ongoing enforcement of Article II, Section 1 against Plaintiffs violates federal law. Mr. King was stripped of his voter registration after he was convicted in 2018 of felony drug possession with intent to distribute, which was not a crime at common law in 1870. JA31[FAC¶¶15-16]. Although Mr. King has fully discharged his sentence, he cannot register unless Governor Youngkin restores his voting rights through the restoration process administered by Secretary Gee. JA32[FAC¶18]. Likewise, Ms. Johnson is precluded from re-registering to vote on the basis of her 2021 conviction for drug possession and distribution felonies that were not common law felonies in 1870. JA32[FAC¶21]. Secretary Gee's office denied Ms. Johnson's rights-restoration application in June 2023. JA32[FAC¶22]. Both Mr. King and Ms. Johnson still seek to register and vote. *Id.*; JA32[FAC¶18].

## 2. Plaintiffs Seek Prospective Relief Enjoining Defendants' Ongoing Violation Of Federal Law.

The FAC seeks an order that "commands … state official[s] to do nothing more than refrain from violating federal law," which is the "precise situation" in which, under the *Ex Parte Young* doctrine, a state official "is not the State for sovereign immunity purposes." *Virginia Office for Protection & Advocacy v.*

*Stewart*, 563 U.S. 247, 255 (2011) ("*VOPA*"). Specifically, the FAC seeks "relief enjoining Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870." JA64-65[FAC Prayer for Relief-¶B]. It also requests "a declaratory judgment finding that Defendants' enforcement of Article II, Section 1 … violates the Virginia Readmission Act." JA64[FAC Prayer for Relief-¶A]. Such a declaratory judgment is proper because the declaration would be "no broader than necessary to complement the injunction against the current violation of federal law," as opposed to a declaration relevant only to a "dispute over the past lawfulness of [an official's] action" in support of a request for damages or restitution. *Green v. Mansour*, 474 U.S. 64, 69, 73 (1985). In practical terms, Plaintiffs seek an order prohibiting Defendants from continuing to violate the Readmission Act by rejecting their voter registration applications.

### 3. Defendants' Objections To The *Ex Parte Young* Exception Should Be Rejected.

Defendants offer several reasons why *Ex Parte Young* is supposedly inapplicable here. Tellingly, none are grounded in precedent from this Court or the Supreme Court.

***First***, Defendants are wrong to baldly assert that, to invoke *Ex parte Young*, a plaintiff must identify an "individual federal right[]" as when pleading a section

1983 claim, since that is an issue pertinent to identifying a cause of action, not jurisdiction. *See* Br.17. Defendants cite no case to support adding this requirement to the Court's well-established *Ex parte Young* analysis of whether subject matter jurisdiction exists in the face of sovereign immunity. *See* Br.17-18. The cases Defendants do cite make the uncontroversial point that *Ex parte Young* is a jurisdictional doctrine, so a plaintiff must still identify a "cause of action from somewhere else." *Michigan Corrections Organization v. Michigan Department of Corrections*, 774 F.3d 895, 905 (6th Cir. 2014). Here, the district court held that Plaintiffs plausibly state a claim in federal equity. *See* JA202-205. And *Michigan Corrections* is consistent with decisions from other circuits that analyze whether the plaintiff has stated a claim under a cause of action separately from whether *Ex parte Young* provides subject matter jurisdiction in the face of the Eleventh Amendment. *See, e.g.*, *Green Valley Special Utility District v. City of Schertz*, 969 F.3d 460, 473-475 (5th Cir. 2020) (*en banc*) (holding that plaintiff "'satisfied the straightforward inquiry' under *Young*" and, "[w]ith the jurisdictional questions resolved," separately concluding that it had "a cause of action … at equity, regardless of whether it can invoke §1983" (quoting *Verizon*, 535 U.S. at 645)).

Defendants' suggestion of an individual rights requirement in the sovereign immunity analysis is also at odds with this Court's description of the *Ex parte Young* doctrine as principally a means of preserving the constitutional structure of

federalism.  For instance, in *Antrican*, this Court explained that the "*Ex parte Young* exception to Eleventh Amendment immunity is designed to preserve the constitutional structure established by the Supremacy Clause."  *Antrican*, 290 F.3d at 184.  The Supreme Court has likewise discussed *Ex parte Young* as "giv[ing] life to the Supremacy Clause," and it has justified limiting jurisdiction to requests for prospective relief by explaining that "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law."  *Green*, 474 U.S. at 68.[5]

In any event, the Virginia Readmission Act does protect individual rights, which will be vindicated through Plaintiffs' cause of action in federal equity.  But for their felony convictions, Plaintiffs would be qualified voters under the Virginia Constitution and the Virginia Readmission Act.  *See supra* pp.15-17.  The Virginia Readmission Act by its plain terms prohibits Virginia's Constitution from being "amended or changed as to deprive ***any citizen or class of citizens*** of the United

---

[5] Defendants wrongly suggest that *Ex Parte Young* jurisdiction lies only where a state official's actions allegedly violate a provision of the United States Constitution.  *See, e.g.*, Br.15 (quoting *VOPA*, 563 U.S. at 255); Br.17 ("Plaintiffs' … claim does not contend that Defendants are violating any federal constitutional right; it is solely statutory.").  The Supreme Court has held that *Ex Parte Young* doctrine applies equally where a state official's action violates a federal statute.  *See, e.g.*, *VOPA*, 563 U.S. at 250 (citing 42 U.S.C. §§15001 *et seq.* and 10801 *et seq.*).  *See also Antrican*, 290 F.3d at 184 (citing *Green*, 474 U.S. at 68) (It is "proper" under *Ex Parte Young* to seek injunctive relief against a state official's "future conduct" that would "violate … a federal statute.").

States of ***the right to vote***," other than for the fixed set of offenses that were felonies at common law in 1870. This is "the kind of 'rights-creating' language required to confer a personal right on a discrete class of persons." *Planned Parenthood South Atlantic v. Baker*, 941 F.3d 687, 697 (4th Cir. 2019). "[P]rime example[s]" of such "rights-creating language" include statutory references to entitlements belonging to "any individual," *id.*, or express references to "rights," *Health & Hospitals Corp. v. Talevski*, 143 S. Ct. 1444, 1457 (2023). Legislative history is consistent with this textual evidence. One Congressional proponent of the Virginia Readmission Act explained: "The 'fundamental condition' fixes ***the rights of citizens***, and the courts will furnish redress for their violation … if Virginia should change her constitution so as to deny to citizens the right secured by this 'fundamental condition.'" Cong. Globe, 41st Cong., 2d Sess. 432 (1870).[6]

***Second***, Defendants wrongly assert that invoking *Ex parte Young* is inappropriate unless a plaintiff seeks only "an equitable anti-suit injunction." Br.19 (quoting *Michigan Corrections*, 774 F.3d at 906). This Court has made clear that

---

[6] Plaintiffs could not have filed as-of-right an interlocutory cross-appeal of the district court's dismissal of their claim under section 1983, which implicates the issue of whether the Virginia Readmission Act contains rights-creating language. *See* JA199-203. As explained above, *Ex parte Young* does not require identifying an individual right under federal law, and thus this Court need not reach this issue. However, Plaintiffs maintain that the Virginia Readmission Act contains rights-creating language for purposes of section 1983 and reserve the right to appeal, upon entry of final judgment, the district court's ruling to the contrary.

what matters is "whether the injunctive relief sought is prospective or retroactive in nature," *Antrican*, 290 F.3d at 186, not whether "the State is … threatening to sue anyone," Br.19 (quoting *Michigan Corrections*, 774 F.3d at 906). This Court has also repeatedly applied *Ex Parte Young* to requests for relief other than anti-suit injunctions. For instance, in *Franks v. Ross*, this Court reversed dismissal and held that *Ex parte Young* applied to a request "that the court 'enjoin [d]efendants from constructing, operating, and/or maintaining [a] … [l]andfill'" in violation of federal law. 313 F.3d 184, 191 (4th Cir. 2002). And in *Antrican*, the Court affirmed application of the *Ex parte Young* exception to a suit requesting relief enjoining defendants from failing to provide adequate and accessible dental care. 290 F.3d at 184-185.

Ignoring this Court's precedent, Defendants rely entirely on the Sixth Circuit's *Michigan Corrections* decision. But *Michigan Corrections* does not hold that an anti-suit injunction is the sole relief available under *Ex Parte Young*. Rather, *Michigan Corrections* refers to an anti-suit injunction as an ***example*** of an action that can be brought under *Ex Parte Young*. 774 F.3d at 905-906 (discussing "an implied right of action, §1983, or … a private cause of action" under a federal statute as other potential sources for a right of action to assert via *Ex parte Young*).

***Third***, Defendants admit that Plaintiffs' requested relief on its face is a prospective, prohibitory injunction, Br.20 ("Plaintiffs frame their requested relief in

the negative"), but baldly assert—without a single citation to binding precedent—that Plaintiffs' prayer for relief is irrelevant because "in substance, [Plaintiffs] are asking the court to compel Defendants to take the affirmative step of registering them to vote." *Id.* Defendants' assertion misreads the FAC and contradicts this Court's *Ex parte Young* case law.

Plaintiffs nowhere ask the Court to order Defendants to register them to vote; they seek only protection from disenfranchisement and Defendants denying their registration applications, in violation of federal law. While Article II, Section 1 purports to automatically disqualify people with felony convictions from voting, that disqualification is unlawful because the Virginia Readmission Act prohibits Virginia from punishing felony convictions with disenfranchisement—other than for felonies at common law as of the passage of the Act. Plaintiffs seek a declaratory judgment confirming as much and an injunction to prevent Defendants from stripping people convicted of any felony of their right to vote under color of Article II, Section 1. That is "quintessential … prospective injunctive relief" to which *Ex parte Young* applies. *Dobson*, 68 F.4th at 165.

This Court rejected Defendants' gambit in *Antrican*. 290 F.3d at 185. The *Antrican* plaintiffs sought declaratory relief and "an injunction requiring the [state] defendants to 'make needed dental services immediately available to Medicaid beneficiaries in their respective localities.'" *Id.* at 183-184 (quoting prayer for relief).

The *Antrican* defendants, as here, sought to recharacterize the prayer for relief by focusing on one action they might have to take to comply with the requested relief. *Id.* at 185 (noting defendants "assert[ed] that while the plaintiffs phrase their request in terms of prospective injunctive relief, they actually seek an order directing the State to raise the Medicaid reimbursement rates paid to participating dentists"). But this Court rejected that argument, holding that "the proper focus [under *Ex parte Young*] must be directed at whether the injunctive relief sought is prospective or retroactive in nature," not the kinds of actions that might have to be taken to comply with an injunction. *Id.* at 186 (rejecting defendant's argument that relief is not prospective because it "would require the expenditure of substantial sums" of state funds). Defendants do not dispute now (and did not dispute below) that Plaintiffs' prayer for relief is entirely prospective, because it seeks no compensation for past injury. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 747 (4th Cir. 2018) (describing "retrospective relief" as that which seeks "a form of compensation for [a] past wrong"). Plaintiffs only seek to prevent an ongoing violation of federal law from continuing.

**Fourth,** Defendants vaguely suggest, in reliance on out-of-context snippets of caselaw, that "Plaintiffs seek to compel Virginia to extend to them an affirmative privilege its laws do not currently afford," so "the state is the real substantial party in interest," and that this is not the "precise situation" covered by *Ex parte Young*.

Br.13 (quoting *VOPA*, 563 U.S. at 255).  But, as explained above, the FAC seeks no order granting an affirmative privilege, only a declaration that Plaintiffs' disenfranchisement is unlawful and an order enjoining the defendant state officials from enforcing Virginia's felony disenfranchisement provision in violation of the Virginia Readmission Act's express limitation.  *See supra* pp.25-26.  In any event, this Court has previously held that an order that "would necessarily require [the State] itself to change its [law] to come into compliance with the [federal statute at issue]" is "precisely the type of order that is allowed under *Ex parte Young* and its progeny."  *Antrican*, 290 F.3d. at 189.  Defendants cannot escape the *Ex parte Young* exception by arguing that "the State is … the 'real party in interest'" because that assertion "applies to every *Ex parte Young* action," as "[i]njunctive relief of th[is] type … will almost always, in some sense, affect the State itself."  *Id.* at 188-189 ("reject[ing] Virginia's claim that the State was the real party in interest," such that *Ex parte Young* does not apply).  In other words, where a plaintiff has satisfied *Ex parte Young's* requirements, the State is not the real party in interest.[7]

*Fifth,* the text of the Virginia Readmission Act contains no "detailed remedial scheme for the enforcement against a State of a[ny] statutorily created right" that

---

[7] Defendants have never suggested, either before the district court or in their opening brief on appeal, that this case "present[s] a special sovereignty interest that would allow [Virginia] to use its sovereign immunity shield to avoid an otherwise proper *Ex Parte Young* action."  *Antrican*, 290 F.3d at 189.

would suggest *Ex parte Young* does not apply here, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996). *See* Br.21, 29. The text of the Virginia Readmission Act does not establish a "remedial scheme" for ongoing enforcement against the state, let alone the kind of "intricate procedures set forth" in the statute at issue in *Seminole Tribe*. 517 U.S. at 74-75. *See, e.g.*, *Verizon*, 535 U.S. at 647-648 (holding express authorization of federal court review of state commission "determinations" insufficient to implicate *Seminole Tribe*). Nothing in the text or structure of the Readmission Act "suggest[s] a congressional intent to foreclose an *Ex Parte Young* action" because the Act "does not purport to limit the remedies available in a suit against a defendant other than a state." *Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474, 497 (4th Cir. 2005) (holding that Rehabilitation Act's incorporation of the "remedies, procedures, and rights" of Title VI of the Civil Rights Act did not give rise to an inference of congressional intent to preserve state sovereign immunity). Defendants therefore have no basis to suggest that the Act's imposition of "fundamental conditions" on the 1870 readmission of Virginia's congressional delegation implies that expulsion of Virginia's delegation is the exclusive remedy for violation of those conditions more than 150 years later. *See* Br.29.

Regardless, even if the Virginia Readmission Act established expulsion of Virginia's delegation as a remedial scheme (which it does not), *Ex parte Young*

would still apply. The inconsistency between "[p]ermitting suit under *Ex parte Young*" and a "'detailed remedial scheme'" arises only if that scheme limits private parties to obtaining a "'quite modest set of sanctions,'" because such a limitation can "display[] an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young*." *Verizon*, 535 U.S. at 647 (quoting *Seminole Tribe*, 517 U.S. at 75). Stripping Virginia's nearly nine million residents of their congressional representation would not be a "'modest set of sanctions' evidenc[ing] Congress' intent to limit the State[']s exposure for violations of the statute." *Constantine*, 411 F.3d at 497. *Seminole Tribe* is therefore inapposite.

As in *Williams*, Plaintiffs "allege … [D]efendants' ongoing violation of federal law—the enforcement of a state constitutional provision that conflicts with the federal Readmission Act." 954 F.3d at 738. And this Court has been clear that "the proper focus" for an *Ex parte Young* analysis is "whether the injunctive relief sought is prospective or retroactive in nature." *Antrican*, 290 F.3d at 186. Because Plaintiffs seek an order prohibiting Defendants from disenfranchising them under a state-law provision that violates the Readmission Act, "they may pursue [this] prospective relief under *Ex parte Young*." *Williams*, 954 F.3d at 738-739.

## B. Plaintiffs Adequately Allege That Defendants' Continuing Enforcement of Article II, Section 1 Violates Federal Law.

For citizens to sue a state official in federal court, they must adequately allege that the official's ongoing actions violate *federal* law, because "the *Ex Parte Young*

exception does not apply to actions against State officials seeking to compel their compliance with **State** law." *Antrican*, 290 F.3d at 187 (citing *Pennhurst*, 465 U.S. at 106). Defendants now reassert their position, correctly rejected by the district court, that *Pennhurst* bars this action because Plaintiffs' Virginia Readmission Act claim supposedly "is ultimately based on state law," Br.36; *see* JA196. But Defendants' argument ignores the plain text of both the Virginia Readmission Act and the FAC, which nowhere asks a "federal court [to] instruct[] state officials … to conform their conduct to [Virginia] law." *Pennhurst*, 465 U.S. at 106.

The FAC satisfies *Pennhurst* because it alleges that the Virginia Readmission Act—a federal statute—prohibits Defendants' ongoing enforcement of Article II, Section 1 to strip Plaintiffs of their rights to vote. The Virginia Readmission Act has never been overruled or repealed, and therefore remains good law. JA42[FAC¶55]. Its plain language prohibits Virginia from amending its constitution to disenfranchise citizens for conviction of crimes that were not felonies at common law in 1870, such as drug offenses—which did not exist in 1870—including those of which Plaintiffs were convicted. JA48[FAC¶¶70-71].

As in *Williams*, Plaintiffs' prayer for relief—a request for a declaratory judgment that Virginia's felony disenfranchisement regime violates the Virginia Readmission Act and for an injunction prohibiting Defendants from continuing to disenfranchise people under color of that unlawful regime—requests only "a judicial

finding that [Article II, Section 1] violates the [Virginia] Readmission Act." 954 F.3d at 739-740. Even were Plaintiffs' claim to require analysis of the 1869 Constitution, as Defendants assert, *see* Br.37, it does not request any state law's **enforcement**. No Circuit applies *Pennhurst* as expansively as Defendants suggest. *See id.* ("[B]y issuing an injunction based on [an] interpretation [of Virginia's 1869 Constitution], a court would be ordering Defendants … to comply with an interpretation of state law."). To the contrary, as in *Williams*, a Readmission Act claim "does not run afoul of *Pennhurst* because it does not ask the court to compel compliance with 'state law *qua* state law;'" it merely "asks the court to interpret the meaning of a *federal* law … by reference to a related state law." 954 F.3d at 740.

Tellingly, Defendants cite no case from any court to support their assertion that *Pennhurst* bars a federal court from interpreting state law along the way to enforcing federal law through an action under *Ex parte Young*. *See generally* Br.36-39. That is because the courts of appeals roundly and rapidly rejected Defendants' precise argument soon after *Pennhurst* was decided. As Defendants concede (Br.36-38), Plaintiffs' claim at most may require "the district court to **ascertain**" the scope of the 1869 Constitution's felony disenfranchisement provision, but "[t]he ascertainment of state law is an everyday function of the federal court," and "ascertaining state law is a far cry from compelling state officials to comply with it," *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985); *see also Mont v. Heintz*,

849 F.2d 704, 710 (2d Cir. 1988) (same). In *Ex parte Young* actions "federal courts must necessarily construe local law and administrative regulations to ascertain if there is a liberty interest protected by … federal [law]." *Patchette v. Nix*, 952 F.3d 158, 162 (8th Cir. 1991); *see also Word of Faith World Outreach Center Church, Inc. v. Morales*, 986 F.2d 962, 965 (5th Cir. 1993) (same). Indeed, this Court has likewise recognized that *Pennhurst* is not implicated even where there is "an explicit incorporation of State law into federal law." *Bragg*, 248 F.3d at 288, 297 (distinguishing federal incorporation of state law from a federal mining statute that vested "'exclusive jurisdiction over the regulation of surface coal mining' within its borders" (quoting 30 U.S.C. §1253(a)).

Defendants' misleading citation to *Williams* portrays the Fifth Circuit's *Pennhurst* analysis as holding that Plaintiffs' requested relief requires enforcement of state law. But comparing the FAC's Readmission Act claim to the claim in *Williams* confirms why *Ex parte Young* applies. The *Williams* plaintiffs advanced a claim for a two-part declaratory judgment: (i) "that Section 201 of the Mississippi Constitution is violating the Readmission Act" and (ii) "that the requirements of Article VIII, Section 1 of the [Mississippi] Constitution of 1868 remain legally binding on the Defendants." 954 F.3d at 734. As explained above, the Fifth Circuit held that the first request—which is similar to the declaratory relief Plaintiffs seek here—was for "prospective relief that is permissible under *Ex parte Young*." *Id.* But

the second request—which has no analog in this case—sought "a judicial declaration that a state law enacted over 150 years ago remains valid and enforceable," and so was "barred by … *Pennhurst.*" *Id.* at 734, 740-741. Here, Plaintiffs have ***not*** requested, in either form or substance, that the federal courts order Defendants to conform to any provision of the 1869 Virginia constitution. The first sentence of Article II, Section 1 of the ***current*** Virginia Constitution provides that Plaintiffs (as citizens of the United States, adults over eighteen years of age, and residents of Virginia) are qualified voters, but-for Defendants' unlawful enforcement of the felony disenfranchisement provision. The substance of Plaintiffs' claim is that because the Virginia Constitution has been amended since 1870 and purportedly disenfranchises them for convictions of felonies (such as drug offenses) that were not felonies at common law in 1870, the Virginia Readmission Act prohibits Plaintiffs' disqualification.[8]

Defendants also omit that the *Williams* court rejected another of their arguments: Defendants contend that Plaintiffs do not really seek enforcement of the Virginia Readmission Act because the Act supposedly prohibits only amending the Constitution unlawfully, and Plaintiffs "did not ask the district court to enjoin

_____

[8] Defendants allude to their rejected argument that *Richardson v. Ramirez*, 418 U.S. 24 (1974), immunizes any felony disenfranchisement regime, but Defendants do not connect *Richardson* to any aspect of this Court's *Ex parte Young* analysis. *See* Br.38 (citing JA196).

Defendants from seeking to 'amen[d] or chang[e]' the voting provisions of the Virginia Constitution." Br.38. The *Williams* defendants made virtually the same argument. *See* 954 F.3d at 737 (describing argument that requested relief was retrospective because "the Mississippi Readmission Act itself places limitations on the ***amendment*** of the Constitution"). The Fifth Circuit rejected that argument, relying on *Papasan v. Allain*, 478 U.S. 265, 280-282 (1986), to conclude that "the historical origins of the continuing violation are not determinative of the viability of an *Ex parte Young* suit," because "[a]n invalid law produces consequences long after the date of its enactment—that is the very essence of a legal dictate." 954 F.3d at 738. Therefore, because the *Williams* plaintiffs alleged that "Mississippi schoolchildren ***today*** are deprived of their school rights, and … that the current version of Section 201 [of the Mississippi constitution]—presently enforced and maintained by the defendants—is the cause of that harm," their request for relief was prospective. *Id.* Here, Plaintiffs' claim is structurally identical, in that they allege "present[] harm" from the "consequences" of Defendants' enforcement of the Virginia constitution's unlawful felony disenfranchisement provision. *Id.* at 738. Plaintiffs therefore "may pursue prospective relief under *Ex parte Young.*" *Id.* at 739.

## C.  The Governor And Secretary Are Proper Defendants Under *Ex Parte Young.*

*Ex parte Young* provides that "officers of the state[ who] are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten … to enforce" them against a plaintiff in violation of federal law are stripped of sovereign immunity. *Ex parte Young*, 209 U.S. at 155-156. State officials are thus proper defendants only if they have a "special relation to the particular statute alleged" to violate federal law. *Id.* at 157. This Court has held that this "special relation" exists where the official has "*proximity to* and *responsibility for* the challenged state action." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010).

Defendants do not contest now, and did not dispute before the district court, that the Board of Elections Defendants (O'Bannon, Dance, Alvis-Long, Merricks, and Weinstein), the Department of Elections Defendant (Beals), and the general registrar Defendants (Williams and Spicer) bear special relations to the felony disenfranchisement provision of Article II, Section 1 of the Virginia Constitution. Defendants only appeal the district court's conclusion that the Governor and the Secretary also bear special relations to that provision by virtue of their roles enforcing the Commonwealth's disenfranchisement regime. The district court was correct; the Governor and Secretary should not be dismissed.

Article II, Section 1 vests discretion in the Governor to decide whether to individually restore disenfranchised Virginians' voting rights, and the Secretary is

charged with administering this process.[9]  The Governor and Secretary enforce Article II, Section 1 by purportedly setting and applying the criteria by which the voting rights of citizens convicted of felonies may (or may not) be restored.  JA30, 33-34[FAC¶¶12, 25-27].  And a denial of rights restoration by the Governor or the Secretary ensures that such individuals remain permanently disenfranchised.  JA33-34[FAC¶26].  Indeed, the Governor and Secretary are directly responsible for Mr. King's and Ms. Johnson's continued disenfranchisement because they denied Mr. King's and Ms. Johnson's rights restoration applications.  JA32[FAC¶22]; Br.7 n.1. For example, the Eleventh Circuit permitted an Equal Protection claim concerning felony disenfranchisement to proceed against Florida's Governor and Secretary of State, both of whom possessed discretionary authority under the Florida Constitution to grant restoration of rights.  *See Johnson v. Governor of State of Florida,* 405 F.3d 1214, 1217 n.3 (11th Cir. 2005) (*en banc*).  Here, because the Governor and Secretary each bears a "special relation" to the continued disenfranchisement of citizens with felony convictions under Article II, Section 1, the district court correctly found that they are proper defendants under *Ex parte Young*.  Defendants' arguments to the contrary fail.

---

[9] As the Virginia Supreme Court has explained, the Governor's (and, by extension, the Secretary's) responsibility to decide rights restoration applications on a case-by-case basis is necessary to preserve Article II, Section 1's "general rule" that people with any felony conviction are disqualified.  *McAuliffe*, 292 Va. at 349.

***First,*** the Governor's and Secretary's connections to Virginia's felony disenfranchisement regime derives from more than their general duties to enforce Virginia's laws. *Cf.* Br.25-26. State executive officers are "proper defendant[s] in an [*Ex parte Young*] action" if they "have 'a specific duty to enforce' that law" that gives them "some connection with the enforcement of the act." *Disability Rights South Carolina v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Here, Article II, Section 1 expressly and undisputedly vests the sole authority to consider and decide applications for restoration of voting rights in "the Governor or other appropriate authority." Va. Const. art. II, §1; *see also McAuliffe*, 292 Va. at 338, 352-353. The Governor's and Secretary's roles thus extend far beyond mere general duties to enforce state law.

***Second,*** Defendants wrongly insist that the Governor's and Secretary's responsibilities for administering the rights restoration process give them "no role in effectuating disenfranchisement." Br.27. Specifically, Defendants assert that "felon disenfranchisement happens automatically under Virginia's Constitution—upon conviction of a felony, an individual loses his qualification to vote." Br.23. But the question this case presents is whether Article II, Section 1 violates federal law, and Defendants concede that the Governor and the Secretary execute the rights restoration provision of Article II, Section 1. *See* Br.6.

In addition, Defendants conflate the Virginia Constitution's purported automatic *initial* disenfranchisement of citizens with Defendants' *ongoing* disenfranchisement of those citizens. The Governor and the Secretary are proper *Ex parte Young* defendants because their administration of the rights restoration process is part of the apparatus for effecting ongoing disenfranchisement. Every time the Governor and Secretary reject a rights restoration application—as they have done for Plaintiffs here—they implicitly inform the applicant that he or she is not permitted to register or vote, thereby extending the voter's disenfranchisement. Even if the Virginia Constitution's disqualification provision were declared unconstitutional as applied to people convicted for offenses that were not common law felonies in 1870, if the Governor and Secretary continued to reject rights restoration applications from citizens protected by the Virginia Readmission Act, those qualified people would likely not register to vote. Therefore, at a minimum, it would be appropriate to order the Governor and Secretary to provide a notice of registration eligibility to people currently prohibited from registering to vote or who apply for rights restoration who cannot be lawfully disqualified under the Virginia Readmission Act. Such notice relief is permitted under *Ex parte Young* "as ancillary to the prospective [injunctive] relief [otherwise] ordered by the court." *Quern v. Jordan*, 440 U.S. 332, 349 (1979) (affirming order requiring *Ex parte Young*

defendants to "prepar[e] and mail[]" notices to people informing them of "existing state administrative procedures which they may wish to pursue").

**Third,** Defendants assert that the Governor and Secretary should be dismissed from this action because they are busy and litigation is burdensome. *See* Br.25-26. But Defendants' cited cases all involve officials resisting discovery—none grants immunity or dismissal. *See In re United States Department of Education*, 25 F.4th 692, 701 (9th Cir. 2022) (seeking to quash deposition subpoena); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (seeking a protective order for a deposition); *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993) (seeking to quash a subpoena); *In re Stone*, 986 F.2d 898, 904 (5th Cir. 1993) (seeking exception from obligation to have a representative with settlement authority attend pretrial conferences).

**Finally,** Defendants argue that Plaintiffs "lack standing to pursue their claims against the Governor and the Secretary." Br.28. Not so. As an initial matter, Defendants failed to preserve the argument by not fully developing it and instead only raising the argument in a single footnote before the district court. *See* District Court Docket 77 at 10 n.4; JA196-197; *Foster v. University of Maryland-East Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015) (holding that an argument limited to an isolated footnote is waived). And, in any event, this Court has held there is no appellate jurisdiction to review standing issues on an interlocutory appeal of a denial of

sovereign immunity. *See Dobson*, 68 F.4th at 168 (rejecting pendent appellate jurisdiction over standing arguments because "the standing argument does not rest on the '***same specific question***' that '***will necessarily resolve***' or would be necessary to review the Eleventh Amendment immunity issue"); *infra* p.47-50. That certain "principles" from the Eleventh Amendment context are transferable to the standing context does not establish appellate jurisdiction over standing arguments. *McMaster*, 24 F.4th at 901.

But even if this issue were reviewable, Plaintiffs have standing to pursue their claims against the Governor and Secretary for the same reasons the Governor and Secretary are proper *Ex parte Young* defendants. *See supra* §I.C. Notably, the Governor, through the Secretary, denied both Plaintiffs' voting rights restoration applications, continuing Plaintiffs' permanent disenfranchisement, even though Plaintiffs' offenses of conviction were not felonies at common law in 1870.

The district court accurately applied this Court's *Ex parte Young* jurisprudence to the FAC and found that sovereign immunity does not bar this action. That conclusion should be affirmed.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE AMENDED COMPLAINT STATED A CLAIM FOR RELIEF UNDER FEDERAL EQUITY.

Defendants are entitled to appeal only the district court's denial of sovereign immunity under the collateral order doctrine, which provides only for immediate review of "essential prerequisite[s] to determining the [only] … immediately

appealable claim …: Eleventh Amendment immunity." *Dobson*, 68 F.4th at 167.

Under 28 U.S.C. §1291, Defendants must wait until the district court renders a final

judgment to appeal any other issue (or petition the district court and then this Court

under 28 U.S.C. §1292 for leave to bring an interlocutory appeal). But Defendants

nevertheless seek review of the district court's Rule 12(b)(6) ruling that the FAC

states a plausible claim for relief under federal equity. *See* JA203-204. There is no

appellate jurisdiction to support this aspect of Defendants' appeal. The Court

therefore should not reach the issue. And if the Court were to consider whether the

FAC states a claim in federal equity, it should affirm, because Defendants' new

argument about congressional intent is meritless.[10]

> ### A. The Collateral Order Doctrine Does Not Permit Interlocutory Review Of Whether The Amended Complaint States A Claim.

The collateral order doctrine creates an "exception … for claims involving

Eleventh Amendment immunity" to the general rule that "appellate jurisdiction is

limited to final orders from the district courts." *Dobson*, 68 F.4th at 166; *see Puerto*

*Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-146

(1993) (denial of Eleventh Amendment sovereign immunity is immediately

---

[10] As the district court explained in its order (JA204), Defendants' motion to dismiss nowhere presented the argument advanced in Defendants' opening brief—that congressional intent precludes stating a claim under federal equity. *See generally* D.Ct. Dkt. 77 at 7, n.3, 16-17. Defendants "may not raise [that] new argument[] on appeal," because it was "not first presented to the district court below." *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022).

appealable). This Court just last year reaffirmed that even "vital threshold issue[s]" such as "standing and abstention" defenses are not reviewable where the collateral order doctrine provides for interlocutory appeal of a sovereign immunity ruling. *Dobson*, 68 F.4th at 166-167.

Defendants concede that the collateral order doctrine does not provide appellate jurisdiction to review whether the FAC states a claim for relief under federal equity. *See* Br.22 n.3. Instead, Defendants suggest that this Court should exercise pendent appellate jurisdiction because, they contend, this Rule 12(b)(6) issue is "inextricably intertwined" with the sovereign immunity question. *See id.* (quoting *Dobson*, 68 F.4th at 166-167). Defendants are incorrect. Issues are "inextricably intertwined" when "*the same specific question* will underlie both [issues] … such that *resolution of the question will necessarily resolve the appeals from both orders at once*." *Dobson*, 68 F.4th at 167. However, a separate issue is not reviewable under pendent appellate jurisdiction simply because it "*could* foreclose the need to address the immunity defense." *Id.* at 168 (holding "that is not the pendent jurisdiction test").

There is no pendent appellate jurisdiction over Defendants' Rule 12(b)(6) argument regarding the federal equity cause of action, because that argument does not turn on "the same specific question" as the immediately appealable Eleventh Amendment immunity question. *Dobson*, 68 F.4th at 167. That is, whether *Ex parte*

*Young* provides an exception to sovereign immunity is an analytically separate question from whether a plaintiff has stated a cause of action in federal equity. *See Armstrong v. Exceptional Child Center Inc.*, 575 U.S. 320, 326-329 (2015). The sovereign immunity issue depends on whether Plaintiffs have requested prospective injunctive relief to prohibit ongoing violations of federal law. *See supra* pp.21-22. Whether Plaintiffs stated a claim in federal equity hinges on whether the Virginia Readmission Act evinces congressional "intent to foreclose equitable relief," which depends on whether Congress established an exclusive remedy for its violation and whether the Readmission Act's dictate is "judicially unadministrable." *Armstrong*, 575 U.S. at 328; *see* Br.29-35; JA202-205. Tellingly, Section I.C. of Defendants' opening brief—in which they assert that Plaintiffs' federal equity claim is foreclosed under *Armstrong*—does not once refer to sovereign immunity. *See* Br.29-35. Though Defendants attempt to muddle these issues, they do not turn on the "same specific question[s]." *Dobson*, 68 F.4th at 167.

Deciding whether Plaintiffs have stated a claim for relief in federal equity under *Armstrong* therefore cannot "necessarily resolve" the sovereign immunity issue. *Dobson*, 68 F.4th at 167. Rather, exercising pendent jurisdiction over Defendants' Rule 12(b)(6) argument would require this Court "to grapple with … questions" about the text, structure, history, and application of the Virginia Readmission Act that may go to the merits of Plaintiffs' claim but would not

otherwise be implicated by this appeal. *Id.* The Supreme Court has squarely held that the proper "*Ex parte Young* inquiry" on interlocutory appeal "'does not include an analysis of the merits of the claim.'" *Id.* at 164 (quoting *Verizon*, 535 U.S. at 646).

Accordingly, there is no appellate jurisdiction for interlocutory review of the district court's rejection of Defendants' Rule 12(b)(6) argument that the FAC plausibly states a claim in federal equity. The Court should therefore decline to reach the issue, and address it, if necessary, only after a final judgment has been rendered, when Plaintiffs are able to simultaneously appeal the district court's dismissal of their other claims, including their claims brought under Section 1983 and the Eighth Amendment. *See supra* n.6.

## B. The District Court Correctly Found That Plaintiffs Have A Cause Of Action Under Federal Equity.

Even if the Court were to overlook these jurisdictional defects and entertain an interlocutory appeal of this Rule 12(b)(6) issue, the district court's holding that Plaintiffs stated a claim in federal equity should be affirmed.

"[E]quitable relief … is traditionally available to enforce federal law." *Armstrong*, 575 U.S. at 329. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* at 326. These "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the

federal interest in assuring the supremacy of that law." *Green*, 474 U.S. at 68. Yet the cause of action to "assur[e] the supremacy of federal law" is not conferred by the Supremacy Clause, nor need it arise as private right of action under a federal statute. *Armstrong*, 575 U.S. at 326, 331. Rather, "[w]hat [the Supreme Court's] cases demonstrate is that, 'in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer.'" *Id.* at 327.

Private parties may thus sue "to enjoin unlawful executive action" unless there is an "express [or] implied statutory limitation[]." *Armstrong*, 575 U.S. at 327. "Congress's 'intent to foreclose' equitable relief" can be established through the combination of two factors. *Id.* First, "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id.* at 328 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Second, when a statute creates a "judicially unadministrable" standard and "[e]xplicitly confer[s] enforcement of th[at] judgment-laden standard upon" a particular federal official, it "establishes … that Congress 'wanted to make the agency remedy that it provided exclusive.'" *Id.* Defendants cannot establish either *Armstrong* factor.

**1.    The Virginia Readmission Act Does Not Contain A Specified Remedy That Would Preclude Relief Under Federal Equity.**

The Virginia Readmission Act does not "express[ly] provi[de] one method of enforcing [its] substantive rule" prohibiting Virginia from amending its Constitution

to expand felony disenfranchisement. *Armstrong*, 575 U.S. at 329. The Virginia Readmission Act does not specify *any* consequence should Virginia violate the Act, and when a statute "mentions no remedies at all, … it certainly does not purport to limit the remedies available in a suit." *Constantine*, 411 F.3d at 497. The text of the Virginia Readmission Act therefore reflects no congressional intent to provide an exclusive remedy.

The Virginia Readmission Act's legislative history confirms that textual evidence: the Reconstruction Congress expected that federal courts would enforce the Virginia Readmission Act's terms if Virginia manipulated its laws to again disenfranchise Black citizens. *See generally* JA106-107. As Congressman William Lawrence (R-Oh.) explained, "[t]he 'fundamental condition' fixes the rights of citizens, and *the courts* will furnish redress for their violation." Cong. Globe, 41st Cong., 2d Sess. 433 (1870). Congressman Lawrence further explained that "[t]he *national courts* are or may be clothed with the requisite power to enforce this fundamental law …. [I]f Virginia should change her constitution so as to deny to citizens the rights secured by this 'fundamental condition,' her constitution in that respect would itself be … void, and the national courts would so declare it." *Id.* He was echoed by Congressman John B. Hawley (R-Ill.), who noted that if Virginia or other southern states changed their constitutions to disfranchise Black citizens, "the remedy is in Congress *and the courts*." *Id.* at 481-482. Similarly, Congressman

Hamilton Ward (R-NY) stated that if Virginia "should pass any law or adopt any constitutional change in violation of this fundamental compact *the courts* would hold that these claimants for their rights should have their remedy." *Id.* at 486.

Rather than textual evidence or legislative history, Defendants provide only the unsupported assertion that the Reconstruction "Congress provided for th[e] statute to be enforced solely through … Congress's determination whether to continue to allow Virginia's congressional delegation." Br.29. But the Virginia Readmission Act says no such thing. In says *nothing* about what the consequence will be for violating the Virginia Readmission Act. It says *nothing* about Congress's ongoing evaluation of compliance. And it says *nothing* about the potential for Virginia's representatives to be ejected from Congress as a consequence of a violation.

Defendants' attempt to analogize to contract law based on the unsupported assertion that "the Virginia Readmission Act is in the nature of a contract between Virginia and Congress" because the Readmission Act uses the term "condition precedent," is also flawed. Br.31-32 (repeatedly quoting Williston's treatises on contracts); 16 Stat. 62, 62.[11]  Defendants' contract-theory argument relies on the

---

[11] Defendants do not argue that the Virginia Readmission Act was enacted under the Spending Clause, unlike the Medicaid statute that *Armstrong* analogized to a contract, 575 U.S. at 332. *See* Br.32.

*Armstrong* Court's reasoning on an irrelevant issue; specifically, whether the statute at issue included a private right of action, not whether congress intended to foreclose equitable relief. *Compare Armstrong*, 575 U.S. at 327-329 (addressing whether the plaintiffs could "proceed against [the state] in equity") *with id.* at 331-332 (addressing whether there was "a cause of action for respondents" in "the Medicaid Act itself"); *see* Br.30 (citing *Armstrong*, 575 U.S. at 332); Br.32 (same). Therefore, contrary to Defendants' assertion (Br.30 n.4), the Supreme Court's reasoning regarding this separate issue is not "relevant."[12] Indeed, Defendants' contract theory cannot be squared with this Court's precedent. For example, under Defendants' theory, Title VI funding would amount to a contract between a state and the federal government, whereby the only remedy would be for the federal government to withdraw funding. But this Court in *Constantine* found that Title VI of the Civil Rights Act, which "forbids discrimination on the basis of race, color, or national origin by any 'program or activity' that receives federal funding," allowed for private suits seeking equitable relief. *See Constantine*, 411 F.3d at 497.

---

[12] Defendants also cite bare assertions that Congress has exclusive authority to enforce the Virginia Readmission Act from a Jim Crow-era district court case upholding the disenfranchisement of a Black citizen for her failure to pay a poll tax, *Butler v. Thompson*, 97 F. Supp. 17, 19 (E.D.Va. 1951), and an Arkansas state court decision that relies on *Butler* and wrongly concludes that the Readmission Acts were always legal nullities, *Merritt v. Jones*, 259 Ark. 380, 389 (1976). *See* Br.31. Neither is persuasive, much less binding.

Nothing in the Virginia Readmission Act's text or history thus supports the inference that Congress intended a specific remedial scheme to displace the inherent cause of action in federal equity.

### 2. The Virginia Readmission Act Does Not Contain A Judicially Unadministrable Standard.

The Virginia Readmission Act's "fundamental condition" prohibiting Virginia from expanding its felony disenfranchisement regime is not a judicially unadministrable standard. To the contrary, the "fundamental condition" is based on objective criteria—*i.e.*, whether Virginia has amended its Constitution and whether it has done so to disenfranchise citizens for conviction for offenses that were not felonies at common law in 1870. This standard calls for routine statutory interpretation, a quintessential judicial competence. It is neither "broad and nonspecific" nor requires applying a "judgment-laden standard" that is statutorily committed to the discretion of a single government official. *Armstrong*, 575 U.S. at 328, 333 (Breyer, J. concurring in part). If anything, determining whether an offense was a felony at common law in 1870 is particularly within the judiciary's purview.

Defendants also assert, without any support, that seeking to enforce the specific guarantees and restrictions Congress set down in the Virginia Readmission Act is indistinguishable from making a claim under the Guarantee Clause. *See*

Br.33-34.[13]  Defendants are wrong.  Plaintiffs' claim involves only interpretation of a federal statute and state constitutional provisions—a quintessential judicial task. *See Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 (1986) ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.").

Further, enjoining Defendants from disenfranchising Virginian voters neither "require[s] wading into political decisions that ended the Civil War" nor deciding whether to "depart[] from Congress's continuing determination that Virginia has a republican form of government and is entitled to representation."  Br.34.  Rather, it requires only that the Court determine whether Virginia has amended its constitution since 1870 and whether that amended constitution disenfranchises for offenses that were not felonies at common law in 1870.  That is readily administrable by the courts.

There is no appellate jurisdiction to review Defendants' Rule 12(b)(6) argument at this juncture. But if the Court reaches Defendants' contention that

---

[13] Defendants' argument on this point is a backdoor attempt to challenge the district court's rejection of their contention that this action is barred by the political question doctrine, another argument for which there is no jurisdiction for an interlocutory appeal.  *See* JA197-198; *cf. Dobson*, 68 F.4th at 168 (rejecting pendent appellate jurisdiction over defendant's jurisdiction and abstention arguments).

Plaintiffs failed to state a claim in federal equity, it should affirm the district court's conclusion that Plaintiffs have done so.

## CONCLUSION

For the reasons set forth above, the district court's ruling that Plaintiffs' suit may proceed under the *Ex Parte Young* exception to sovereign immunity should be affirmed and this case remanded to the district court for further proceedings.

Respectfully submitted,

/s/ *Brittany Blueitt Amadi*

<div style="display: flex;">
<div>

VISHAL AGRAHARKAR
EDEN HEILMAN
ACLU FOUNDATION OF VIRGINIA
701 East Franklin Street, Suite 1412
Richmond, VA 23219
(804) 523-2151

JARED FLETCHER DAVIDSON
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
(202) 579-4582

BENJAMIN L. BERWICK
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582

</div>
<div>

BRITTANY BLUEITT AMADI
L. ALYSSA CHEN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000

ROBERT KINGSLEY SMITH
JASON H. LISS
ROBERT DONOGHUE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

NICHOLAS WERLE
MATTHEW WOLLIN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Attorneys for Plaintiffs-Appellees*

</div>
</div>

June 21, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii).

1.  Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,683 words.

2.  The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Brittany Blueitt Amadi*
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC  20037
(202) 663-6000

June 21, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of June, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Brittany Blueitt Amadi*
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000

June 21, 2024